JOHN G. MAHON

*v.*

MARY DECKER MOONEY *et al.*

*Opinion filed April 16, 1902.*

WILLS—*temporary coma not inconsistent with testamentary capacity at other times.* That the testator was at times during his last illness in a comatose condition is not inconsistent with possession of testamentary capacity by him at other times than such intervals.

APPEAL from the Circuit Court of Cook county; the Hon. ABNER SMITH, Judge, presiding.

L. D. CONDEE, H. D. HEADLEY, and R. W. CONDEE, for appellant.

EDGAR BRONSON TOLMAN, and JOSEPH B. DAVID, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery filed by the appellant to contest the will of David C. Mahon, his father. The bill charged that the testator had been induced to execute the will through undue influence exercised by one of the legatees therein, Mary Decker Mooney, and also charged that the testator was lacking in the requisite mental capacity to execute a will. The issues made under the bill were heard before and submitted to a jury for decision. The verdict was adverse to the complainant, (the appellant,) and decree was rendered accordingly. This appeal seeks the reversal of such decree.

The rulings of the court as to the admissibility of testimony and in instructing the jury as to the principles of law applicable to the case are not complained of and are to be regarded as correct. The charge that the execution of the will was induced by undue influence had no support whatever in the testimony, and has been abandoned. But a single ground is urged for reversal of the decree, and that is, that the verdict is against the weight of the evidence upon the question of the mental power and capacity of the testator to dispose of his property by will.

The testator died on Friday, the 11th day of December, 1896, and the will was executed on Tuesday preceding his death. One of the witnesses in behalf of the appellant, a cousin of the appellant and a physician, expressed the opinion that the testator was of unsound mind one year preceding his death, but the evidence was overwhelmingly to the contrary, and counsel for the appellant in their brief say: "The contention of the contestant is that at no time after the Sunday before his death was David C. Mahon in a mental condition to make a valid will." In the investigation of this question we have had the aid of an exhaustive oral argument and also full printed briefs. We have diligently and carefully consulted the evidence preserved in the record. The opinions of many witnesses *pro et con* as to the mental condition of the testator were given in testimony before the jury. Counsel for the appellant contend it was the opinion of the greater number of those witnesses that the testator, on Sunday preceding his death, and from thence until Friday, the day of his death, was of unsound mind and incapable of executing a will. Perhaps in point of number of witnesses, merely, there is a slight preponderance in favor of this contention of the appellant, but where the greater weight of the testimony lies is not to be determined by a mere numbering of witnesses. The testator was, during the period to which this investigation is thus restricted, seriously ill,—at times in

a comatose condition,—and not, at such times, able to resist his physical afflictions and command his mental faculties. Temporary inability to exercise the powers of the mind,—to comprehend and reason rationally,— arising from the ravages of disease, is not inconsistent with the possession of testamentary capacity at other times than at such intervals. There was no proof of irrational acts or conversations on his part at any time during his illness. He was a portion of the time in an unconscious or semi-unconscious condition, and this seems to have been the ground or basis for the opinion expressed by a number of the witnesses that he was incapable of making a will. When not overcome in coma no one seems to have observed any fact or circumstance indicating that he was not of sound disposing mind.

The will was executed on Tuesday preceding the death of the testator on Friday. Dr. Flood, his attending physician, testified that on Monday, (to quote from the abstract prepared by the appellant,) "I told him he would have to prepare for the worst, and he had better get his affairs in shape. He spoke about that himself. I started to make out a memorandum on my prescription blanks of what he wanted to do. I started to make out a memorandum, until he got to specifically state who he was going to leave this piece of property to. I did not want to be mixed up with it, so I told him he had better send for his attorney. He mentioned some money he had in the safety deposit vault,—about $1200. Said it would defray all expenses. He also mentioned some property on Ohio street. I think he mentioned that should go to his son John, or his son John's son. I made out a memorandum of those things, and looked for it three days among a lot of old papers but did not find it. He talked about giving the property he was living in to Mrs. Mooney, and the property next door to somebody by the name of Foss or Doss,—a son-in-law of his. He said that Mrs. Mooney had been looking after him,—

something to that effect.   I had seen Mrs. Mooney in the house; that is all I know of her.   David C. Mahon was sane at that time."   The same witness further testified: "After he had signed his will, when he was awake, he was of sound mind, but he would very readily go back into this sleepy or drowsy condition.   He was sane."

The will was prepared by LeGrand W. Perce, an attorney at law.   Charles D. Alberts, one of the attesting witnesses, detailed the occurrences connected with the making of the will, as follows, (to quote again from appellant's abstract): "The will was signed Tuesday morning.   Col. Perce came the first time on Tuesday, between nine and ten o'clock.   He went in and spoke to Mr. Mahon.   I was in the other room right alongside of him. He brought his stenographer with him.   Mahon told him he wanted to make his will.   I was present at that time —right at the door.   Col. Perce had said to me, 'I want you to sit at the door and see that nobody comes in the room.'   I heard what was said.   John Mahon and his son went into the room where David C. Mahon lay.   At first he didn't seem to recognize John Mahon.   Col. Perce told him that he was there, and said, 'Well, they are coming after I am dead,' or something to that effect, to Col. Perce.   John Mahon came into the room before the will was signed.   I started out to find John Mahon, when I met him coming in the yard.   It was I who told him that his father was pretty sick, and sent him to him. He got there after Col. Perce had arrived.   Col. Perce tried to get Dave Mahon to shake hands with his son. He said to him: 'Mahon, you don't know how long you are going to live now; John Mahon is your only boy; you ought not to die with any ill-feeling toward him; I think you ought to make up with him.'   Dave Mahon said, 'He has not treated me right.'   Col. Perce told him, 'You might as well make up with him.'   They shook hands and John left the room.   Col. Perce then sat down and took notes regarding the will.   He asked him what dis-

position he wished to make of his property. Mr. Mahon said, 'Well, the house on Ohio street is John's anyhow, because it belonged to his mother. One of the houses,' he said, 'I am going to give to Willie.' Willie is his grandson, John Mahon's son. Col. Perce asked him what he was going to give John. He said, 'I ain't going to give John anything.' He again said, 'Well, I want to give Mrs. Mooney something.' Col. Perce asked him what he wanted to give Mrs. Mooney. He answered, 'Well, I thought about dividing up a flat building and giveng her a flat.' Col. Perce said, 'Better give her some money.' Mahon said, 'No, I won't give her any money.' Col. Perce said, 'You better give her a couple of thousand dollars.' Mahon said, 'I guess I know what I want to do.' He was pretty tired and lay back on his pillow. After he was again aroused Col. Perce asked him the same question. He answered, 'I will give her one of the houses, then.' Col. Perce said, 'If you are determined to do that, you had better fix it up now and get done with it, because you are getting pretty weak; I think you had better give your property to your son.' Mr. Mahon said, 'I know what I want to do with my property; I'll do as I damn please.' Col. Perce then drew up the paper and read it to him. I mean this will here. Mr. Stager was present in the room at this time. This was before Adams came into the room. After Col. Perce had read the will to Mr. Mahon he asked him if he were satisfied. Mr. Mahon answered, 'Yes.' He lay down again in bed. Col. Perce then asked him, 'Who do you want to witness this will; do you want Alberts?' Mahon said, 'Yes; I want Alberts to witness it.' Col. Perce then suggested Mr. Adams, an acquaintance of the family. They sent and got Mr. Adams. We went in. We stood at the foot of the bed. Col. Perce asked me to get something that Mr. Mahon could write on. I picked up something of rather solid substance. Mr. Adams and I raised Mr. Mahon up in bed, and I held him and held the paper and ink in my

left hand. I held Mr. Mahon up against my left shoulder, and he signed the will. We laid him down and Col. Perce said, 'Shall I read the will?' Mr. Mahon said, 'You read it once,' or something to that effect. Col. Perce said to me, 'Do you want to read it, Alberts?' I told him I knew what it was; maybe Mr. Adams did not. I knew what was in it, anyhow, and heard it all. Mr. Mahon had heard it. Mr. Adams then went home, and Mr. Mahon said, 'Get my pocket-book and pay the colonel.' So I got the pocket-book and paid him $50. Mr. Mahon remarked, 'It is a damned high price for a few minutes' work, ain't it?' He said it that way, and smiled, and said, 'He only charged me $25 for my wife's will; well, it is 'my last chance, and I guess they will get all the money they can.'"

If these witnesses were worthy of credit, the conclusion that the testator, at the time the will was executed, was possessed of ample mental power to dispose of his property by will, which would inevitably and properly arise in the minds of the jurors, could hardly be dislodged by a mere preponderance in the number of opinions held and expressed by other witnesses as to the mental condition of the testator at other times than when the will was signed and attested. The credibility of these witnesses was a question for the determination of the jury.

The suggestion of counsel for the appellant that "perhaps, after all, the medical testimony in this particular case is the most valuable," cannot avail to overturn the verdict of the jury. Four physicians gave testimony,— that of two of them, Dr. Flood and Dr. Moyer, to the effect the testator was sane; that of Dr. Tracy and Dr. Lambden to the contrary. There is no reason we should decline to accept the verdict of the jury as the true and correct solution of the issue of fact in the case.

The decree is affirmed.

*Decree affirmed.*